**Clyde J. ARNOLD, Jr., et al.**

**v.**

**UNITED STATES POSTAL SERVICE, Appellant.**

**Charles Ray NETHERTON, as class agent**

**v.**

**UNITED STATES POSTAL SERVICE, Appellant.**

**Nos. 87–5361, 87–5362.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 17, 1988.

Decided Dec. 20, 1988.

---

Wilma A. Lewis, Asst. U.S. Atty., Washington, D.C., with whom William Bradford Reynolds, Asst. Atty. Gen., New York City, Jay B. Stephens, U.S. Atty., Stephen E. Alpern, Associate Gen. Counsel, U.S. Postal Service, John D. Bates, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., and Anthony W. DuComb, Atty., U.S. Postal Service, Philadelphia, Pa., were on the brief, for appellant.

Joseph E. Kolick, Jr., with whom Cyril V. Smith and Clay Warner, Washington, D.C., were on the brief, for appellees.

Before BUCKLEY and D.H. GINSBURG, Circuit Judges, and LEONARD I. GARTH,* U.S. Senior Circuit Judge for the Third Circuit.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Senior Circuit Judge GARTH.

BUCKLEY, Circuit Judge:

The United States Postal Inspection Service appeals from a decision of the district court holding that it discriminated against a class of older postal inspectors in violation of the Age Discrimination in Employment Act. The district court ruled that a single element of the Postal Service's Career Path Policy constituted illegal age discrimination by mandating that the most senior postal inspectors transfer to any of

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

fourteen chronically understaffed offices across the country. *Arnold v. Postmaster General,* 667 F.Supp. 6 (D.D.C.1987). We reverse.

## I. BACKGROUND

### A. *Legal Framework*

The Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (1982) ("ADEA"), "broadly prohibits arbitrary discrimination in the workplace based on age." *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978). Specifically, it provides:

> It shall be unlawful for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a) (1982).

In applying the terms of the statute to particular cases, courts have drawn upon Supreme Court decisions detailing the twin methods of proof in race or gender discrimination cases under Title VII of the Civil Rights Act of 1964. Under traditional Title VII analysis, a plaintiff may establish that he was the victim of *disparate treatment* by introducing sufficient evidence to establish a prima facie case of discrimination. The defendant must then come forward and articulate some legitimate, non-discriminatory reason for his actions. Provided the defendant does so, the plaintiff must establish that the defendant's proffered reason is a mere pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). Throughout the entire process, the burden of persuasion remains with the plaintiff and proof of discriminatory intent is critical. *Burdine,* 450 U.S. at 248, 101 S.Ct. at 1089.

Alternatively, a Title VII plaintiff may recover by establishing that a particular employment practice, while neutral on its face, has a *disparate impact* on the protected class. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (Title VII directed to *"consequences* of employment practices, not simply the motivation") (emphasis original). Proof of discriminatory intent is not necessary to prevail on a disparate impact claim. The plaintiff must simply establish, generally through the use of statistical evidence, that the challenged practice has a disparate impact on the protected class. Once this is accomplished, the burden shifts to the defendant to supply evidence that the practice is a "business necessity." *Id.* at 432, 91 S.Ct. at 854. The plaintiff may still prevail if he can prove that a non-discriminatory alternative was available.

In *Johnson v. Lehman,* 679 F.2d 918, 921–22 (D.C.Cir.1982), one of our early forays into ADEA litigation, we expressly held that the disparate treatment mode of analysis is applicable to an age discrimination claim under ADEA. *See also Stacey v. Allied Stores Corp.,* 768 F.2d 402, 407 (D.C.Cir.1985). We have never determined whether a plaintiff bringing suit under ADEA may prevail on a disparate impact theory.

### B. *The Career Path Policy*

The United States Postal Inspection Service employs more than 1,900 postal inspectors across the United States. As the law enforcement branch of the service, it is responsible for "investigat[ing] offenses and civil matters relating to the Postal Service." 39 U.S.C. § 404(a)(7) (1982). The Postal Inspection Service is directed by the Chief Postal Inspector, who in turn reports to the Postmaster General.

In response to a shortage of experienced postal inspectors in fourteen major metropolitan areas ("MMAs"), the Postal Inspection Service instituted the Career Path Poli-

cy ("CPP") on December 1, 1980. Appendix for Appellant ("App.") at 82–92. The goal of the policy was to ensure that these areas would be staffed by a constant supply of experienced postal inspectors, and "to guide inspectors along a career path which provides them experience and exposure." *Id.* at 88.

Generally, postal inspectors are categorized according to certain experience levels, ranging from level 17 to level 24. Postal inspectors ordinarily spend one year as a level 17 inspector, one year at level 19, and two years at level 21 before being promoted to level 23. By the time they reach level 23, postal inspectors will have had experience in each of the four basic investigation areas. Level 24 inspectors are Team Leaders, who supervise groups of inspectors from each of the other service levels. The Inspection Service is authorized by statute to transfer any postal inspector, from any level, at any time. 39 U.S.C. § 1001(e)(2) (1982).

The Career Path Policy was established as a complement to this basic framework. A central objective of the CPP, made explicit in 1984, is to ensure that all level 23 inspectors spend five years in an MMA during the course of their service. App. at 88 ("It is Inspection Service policy that normally all Inspectors will serve at least 5 years in a major metropolitan area as a Level 23/24.").

The CPP establishes three methods for achieving that objective. First, level 23 postal inspectors are encouraged to apply for lateral reassignments to vacancies in an MMA. If more than one level 23 postal inspector bid for a given vacancy, the first to bid is awarded the assignment. Second, if a vacancy is not filled by a voluntary level 23 lateral assignment, the Postal Service advertises the vacancy among level 21 postal inspectors, who may volunteer for lateral reassignment as level 23 inspectors. Finally, if the vacancy is not filled through either of the first two methods, the Postal Inspection Service will refer to a list of current level 23 inspectors and choose the most senior, in terms of service, for mandatory reassignment. Certain postal inspec-

tors are expressly exempted from this final category, including those eligible to retire within five years, those who relocated within the past two years, and those who already served for two years in an MMA. After five years in an MMA, any inspector may ask to be reassigned.

### C. *The Suit*

In September 1982, two years after the CPP was first unveiled, a postal inspector named Charles Netherton filed a class action on behalf of himself and other similarly situated inspectors in the United States District Court for the Middle District of Florida. *See generally Arnold v. Postmaster General,* 667 F.Supp. 6, 12–13 (D.D.C.1987) *("Arnold II")* (outlining procedural history). Netherton claimed that the CPP's provision for the directed transfer of senior postal inspectors had a disparate impact on inspectors aged forty and over in violation of the ADEA.

In August 1985, two additional groups of postal inspectors filed suit in the District of Columbia. The cases were consolidated on September 16, 1986, after the *Netherton* suit had been transferred to the District of Columbia. In December 1986, the United States District Court for the District of Columbia held that the plaintiff class could proceed under a theory of disparate treatment as well as disparate impact and denied cross-motions for summary judgment. *Arnold v. United States Postal Service,* 649 F.Supp. 676 (D.D.C.1986) *("Arnold I").* Finally, by separate order, the district court granted the Inspection Service's motion to bifurcate the trial into separate liability and damages phases.

Following a three-day bench trial, the court issued its opinion in favor of the postal inspectors. First, the district court held that the third aspect of the CPP— which it termed the "senior-first rule"— had a disparate impact on level 23 employees over the age of forty. *Arnold II,* 667 F.Supp. at 19–26. It accepted appellees' statistical proof that the senior-first rule "falls more harshly" on this protected class. *Id.* at 19. After making this initial finding, the court concluded that appellant

had failed to demonstrate that the discriminatory rule could be justified as a business necessity because it "failed to carry its burden of persuading the Court that it had *no other choice* but to transfer the senior and older postal inspectors...." *Id.* at 24 (emphasis original). Finally, the court concluded that even if the defendant had a business necessity to transfer the most senior level 23 inspectors, it could have accomplished this purpose without discriminating against older employees by using a random transfer system. *Id.* at 25–26.

Having concluded that the senior-first rule had a disparate impact on older postal inspectors, the court further found that the Postal Service knew of the correlation between age and seniority, and had therefore intentionally discriminated against level 23 postal inspectors over the age of forty. *Id.* at 26–28. Specifically, the court held that: (1) appellees' statistical proof and anecdotal evidence raised "far more than an inference of age discrimination," *id.* at 27; (2) the Postal Inspection Service did not sustain its burden of producing evidence of a legitimate non-discriminatory reason for the senior-first rule; and (3) any non-discriminatory reason could only have been a pretext for age discrimination because the Postal Inspection Service could instead have used a random transfer system.

Leaving the question of damages to a separate proceeding, the district court enjoined appellant from further reliance on the senior-first aspect of the CPP. *Id.* at 29.

## II. DISCUSSION

### A. *Disparate Impact*

#### 1. Disparate Impact Under the ADEA

■ In *Griggs*, 401 U.S. at 430, 91 S.Ct. at 853, the Supreme Court first held that a Title VII plaintiff can establish race discrimination by demonstrating that a neutral employment practice had a disparate racial impact. Although the Court "has never held that proof of discriminatory impact can establish a violation of the ADEA," *Markham v. Geller*, 451 U.S. 945, 948, 101 S.Ct. 2028, 2030, 68 L.Ed.2d 332

(1981) (Rehnquist, J., dissenting from the denial of certiorari), the district court followed the lead of a number of our sister circuits and held that the disparate impact theory is applicable to this case. *See, e.g., EEOC v. Borden's, Inc.,* 724 F.2d 1390, 1394–95 (9th Cir.1984); *Leftwich v. Harris-Stowe State College,* 702 F.2d 686, 690 (8th Cir.1983); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). *Cf. Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1216–22 (7th Cir.1987) (Easterbrook, J., dissenting).

We do not decide whether the test is applicable to ADEA cases because we conclude that the CPP does not have a disparate impact on postal inspectors who are forty years of age and older.

#### 2. Impact of the CPP on Older Inspectors

The central element of the district court's disparate impact holding was its decision to focus solely on the "senior-first" aspect of the CPP, and to exclude from consideration those postal inspectors who were transferred under the two complementary aspects of the program. The court explained:

> Plaintiffs, however, have made it clear since this lawsuit was filed that they challenge the discriminatory senior-first rule of the Career Path Policy. It is defendant who has tried to mischaracterize plaintiffs' challenge to encompass the entire Career Path Policy in order to dilute the adverse impact that the senior-first rule has on plaintiffs. Plaintiffs have never challenged the aspects of the Policy permitting postal inspectors to volunteer for lateral reassignment.

*Arnold II,* 667 F.Supp. at 19–20 (citations omitted).

By so limiting the scope of its scrutiny, the district court effectively determined the outcome of the case. Appellant does not dispute the district court's finding that the senior-first transfer rule, considered alone, had a disproportionate impact on individuals over forty. Instead, appellant argues that the impact of the CPP must be viewed

in all its facets, including the voluntary transfer provisions. Considered in this light, appellant contends that the CPP did not have a disparate impact on the protected class. According to statistics presented by appellant's expert, inspectors aged forty and above constituted 34.4 percent of all level 23 inspectors eligible for transfer into an MMA, and constituted 33.8 percent of all inspectors actually transferred, either voluntarily or involuntarily. App. at 101, 113. These statistics illustrate the distortions that will result if an analysis of the CPP's impact is limited to just one of its elements.

Appellees argue that the narrow focus adopted by the district court is mandated by *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). That case involved a Connecticut state agency's requirement that candidates for the position of Welfare Eligibility Supervisor pass a written examination that was not shown to be job related. The Court held that because a disproportionate number of blacks had failed the test, it could not be used even though more than a proportionate number of blacks had actually been promoted to that position as a result of the agency's application of an affirmative action program. The Court wrote that such a focus on "the bottom line" is improper because Title VII protects individual employees. *Id.* at 455, 102 S.Ct. at 2534–35. The employer could not use the non-discriminatory later stages of the promotion process to temper the effects of the written examination at the first stage, because those who failed the examination never received consideration at the later stages.

We think that *Teal* is inapposite, and we agree with appellant that the district court erred by focusing solely on the senior-first rule. The central distinction between *Teal* and the current case is that, unlike the pass-fail test at issue in *Teal*, the senior-first rule was not a free-standing element of an employment program. Under the CPP, every level 23 employee was expected to spend five years in an MMA. Thus each level 23 employee can fulfill this uniform service requirement through *either* an early voluntary or a later involuntary transfer.

Those individuals who are subject to involuntary transfers, and protected by the ADEA, were not excluded from the voluntary transfer stage. While the impact of an unfair test on the individual plaintiffs in *Teal* has nothing to do with the fact that other blacks were ultimately promoted, the impact of the CPP on senior postal inspectors can be fairly measured only by taking into account those who, subject to an identical obligation, elected to fulfill their responsibility by volunteering for transfer. Our decision to view the CPP transfer plan as a whole does not involve using the non-discriminatory effects of voluntary transfers to answer the complaint of one who did not have the opportunity to undertake such a transfer. Rather it reflects a realistic assessment of the transfer options available alike to each and every level 23 employee.

Because the district court failed to consider the impact of the senior-first transfer rule within the context of the CPP as a whole, its finding that that rule had a disparate impact on older employees is legally irrelevant. This is so because the court based its factual finding on an erroneous understanding of the perspective appropriate to a disparate impact analysis in this case, assuming such an analysis is applicable to ADEA cases. Thus notwithstanding the court's contrary finding, we conclude that appellees failed to establish that the CPP, taken as a whole, had a disparate impact on older postal inspectors.

B. *Disparate Treatment*

■ Noting that we have previously held that a plaintiff may establish a prima facie case of discrimination with statistics alone, *see Palmer v. Schultz*, 815 F.2d 84, 90 (D.C.Cir.1987), the district court relied on its statistical analysis of the senior-first rule to establish the requisite inference of age discrimination under a disparate treatment analysis. *Arnold II*, 667 F.Supp. at 27.

The district court then found that appellant had not only failed to proffer a non-discriminatory reason for the senior-first rule, but that the rule was "a pretext to mask its

discriminatory animus and motive." *Id.* at 27–28. In so finding, the court relied primarily on anecdotal evidence that appellant was aware of the correlation between age and seniority and had rejected a system of random selection as an alternative even though it had been advised that the senior-first rule might be found in violation of the ADEA.

We disagree. There may well be cases in which seniority is simply a code word for age discrimination. Because the senior-first rule does not stand alone, however, it is neither fair nor reasonable to judge the motives of the Inspection Service by uncoupling the rule from the other aspects of what was clearly intended to be an integrated program. We emphasize again: The CPP established that all eligible level 23 inspectors, young or old, should expect to serve five years in an MMA. Viewed in this context, the purpose of the senior-first rule was not to require that the oldest postal inspectors be transferred, but to establish a rational and orderly system to ensure that all level 23 inspectors serve a tour of duty in an MMA prior to retirement.

In this context, we find the Inspection Service's refusal to substitute a system of random selection for its senior-first rule to be both rational and devoid of any implication of animus. Reliance on a lottery would have reduced incentives for voluntary transfers by encouraging chance-takers to gamble on the possibility that they could reach retirement without ever having contributed the five years of MMA service expected of all level 23 inspectors. We reject the district court's conclusion that the refusal or the lottery alternative proves a discriminatory intent, 667 F.Supp. at 28, because based, as it is, on an incorrect legal premise, it is clearly erroneous. The implications of the employer's awareness of the senior-first plan's effects can only be assessed within the context of the larger, comprehensive program of which it is an integral part.

Viewed from this perspective, and applying the three-pronged analytical framework that governs our disposition of disparate treatment cases, we conclude that appellees failed to establish a violation of the ADEA.. First, the evidence supplied by appellees did not establish a prima facie case of discrimination. While we have held that statistical proof may be sufficient to establish discriminatory intent, this is only true where the statistics focus on the appropriate labor pool. *Palmer,* 815 F.2d at 91 n. 6. Second, appellant provided ample evidence of the non-discriminatory reasons that led to the design of the three elements of the CPP. The district court erred in concluding that appellant had failed to rebut the inference of discrimination because of its focus on only the third of those elements. Finally, appellees did not successfully establish that, in this case, appellant's reliance on seniority as a method of selection was simply a pretext for age discrimination. While the appellant apparently realized that the senior-first rule would result in the mandatory transfer of older employees, it relied on the rule as an appropriate mechanism for enforcing an obligation that was both universal and neutral.

### III. Conclusion

Appellees failed to establish that the Postal Inspection Service discriminated against older postal inspectors in violation of the ADEA. Accordingly, the judgment of the district court is

REVERSED.

GARTH, Circuit Judge, dissenting:

I do not agree with the majority of this court that the Career Path Policy of the United States Postal Service can be upheld in the face of the principles, spirit and letter of the Age Discrimination in Employment Act. My disagreement is based on two fundamental grounds: first, is the majority's failure to defer to the district court's findings of fact, all of which are supported by evidence, and none of which can be said to leave us with the "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Second, is the constricted and anomalous interpre-

tation given the ADEA by the majority which holds that even though one component of the Postal Service's policy violates the ADEA, that when combined with the other two components that do not, the flawed component is somehow cured.

Because I am convinced that the majority has erred in both these respects, I respectfully dissent.

## I.

The Age Discrimination in Employment Act makes it unlawful for an employer to discriminate against any employee with respect to the employee's "conditions ... of employment, because of such individual's age; ...." 29 U.S.C. § 623(a). With regard to federal government employment, and in particular with regard to those employed in the United States Postal Service, the Act provides that "[a]ll personnel actions affecting employees ... who are at least 40 years of age ... in the United States Postal Service ... shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Accordingly, if without statutory justification, the Postal Service imposes an onerous condition on those of its employees in the protected age group, 40 years old or over, and that condition is harsher than the condition imposed on younger (less than 40 years of age) employees, the condition cannot be sustained without violating the Act.

In the present appeal, the United States Postal Services Career Path Policy ("CPP") has been challenged by Level 23 postal inspectors over the age of 40, precisely because a condition of the Career Path Policy requires senior inspectors to accept undesirable, expensive and disadvantageous involuntary transfers to Major Metropolitan Areas ("MMAs"), solely because of their seniority, which the district court correlated to their age.[1] The CPP, while permitting *voluntary* Levels 21 and 23 lateral reassignments without regard to seniority, at the same time mandates that the most senior Level 23 inspectors in the

country are obliged to accept *involuntary* directed transfers to Major Metropolitan Areas if the needs of the Service have not been met by the voluntary transfers. These involuntary transfers are made on a "senior-first" basis and are made to locations which are regarded as extremely undesirable because of the high cost of living in those areas. Thus, because of the correlation between age and seniority, by reason of age only, the over–40 inspectors are penalized by transfers not required of their under–40 colleagues.

The district court found that this "senior-first" rule violated the Act under both disparate impact and disparate treatment theories. It found that the postal inspectors' age and seniority were correlated; that the Postal Service knew of that correlation; and that there was no justifiable business necessity for such a policy. The district court also found that the evidence clearly demonstrated that the real business need of the Postal Service, in order to alleviate the shortage of experienced postal inspectors in major metropolitan areas, was not for senior Level 23 inspectors but rather was for "... Level 21 or higher postal inspectors of *any seniority.*" 667 F.Supp. 6, 19 (D.D.C.1987). Accordingly, the district court found that the Postal Service's purported reason for the "senior-first" rule was pretextual and that the "senior-first" rule, by falling more harshly on postal inspectors over the age of 40, was discriminatory in its operation. Indeed, the district court found that the Postal Service intentionally subjected senior Level 23 inspectors to disparate treatment and did so knowingly, and therefore, willfully. Moreover, the record discloses that the findings made by the district court are supported by evidence and thus are not clearly erroneous.

Because we must defer to the district court's findings in our role as an appellate tribunal and because the record clearly demonstrates that the senior inspectors of protected age are adversely affected and

---

**1.** The clear correlation between age and seniority found to exist by the district court is binding upon us. No contention has been made that the

district court's finding was clearly erroneous. *See Arnold v. Postmaster General,* 667 F.Supp. 6, 27 (D.D.C.1987).

adversely treated under the Postal Service Career Path Policy because of their age, I would affirm the district court's order in all particulars.

## II.

The essential flaw in the Postal Service Career Path Policy can best be illustrated by the following example which the government admitted during oral argument, accurately reflects the manner in which the Career Path Policy operates:

Let us assume hypothetically that there are 7 vacancies to be filled in MMAs through the use of the CPP. Assume further that there are 10 Level 23 postal inspectors available to fill those positions: 4 of these inspectors are over the age of 40, and 6 are under the age of 40. If 4 of the under–40 inspectors voluntarily transfer to fill 4 of the MMA vacancies under the voluntary transfer component of the CPP, there would still be 3 vacancies remaining. These 3 vacancies, under the challenged provision of the CPP, would have to be involuntarily filled by directed transfers from the remaining 4 senior inspectors who are over the age of 40. Under the present CPP, the 3 vacancies would automatically be filled by the directed involuntary transfer of 3 of the 4 remaining senior Level 23 over–40 inspectors.

Because the CPP operates in precisely this manner—a manner that patently discriminates against inspectors in the protected age group—it is clear beyond peradventure that the implementation of the CPP by the Postal Service violates the ADEA. Neither the explanations offered by the Service nor the justification proffered by the majority can alter the stark reality of the policy's operation: if an inspector is over 40, he will suffer the disadvantage of an adverse and undesirable posting not otherwise imposed upon any younger colleague.

## A.

Here Arnold has argued that the Postal Service's CPP discriminates against senior (and thus older) Level 23 postal inspectors by requiring these older inspectors to involuntarily transfer to MMAs, rather than being randomly assigned to MMAs without regard to their seniority—ergo age. Arnold advanced two theories of discrimination. Arnold first claimed that the "senior-first" rule has a *disparate impact* on the class of Level 23 inspectors who are over the age of 40 and thus are protected by the ADEA. The district court agreed, finding that the "[p]laintiffs' statistics establish that the adverse effects of the senior-first rule, which involuntarily transfers the oldest postal inspectors to cities with high costs of living, or causes them to resign or volunteer for lateral transfer, falls more harshly on postal inspectors 40 years of age and older than on postal inspectors under 40 years of age." 667 F.Supp. at 18–19.

Arnold also has contended that the senior-first rule constitutes *disparate treatment* of the senior Level 23 inspectors because the Postal Service *knew* the correlation between age and seniority but nevertheless implemented the use of the rule, thus intentionally discriminating against the older inspectors on the basis of their age by forcing them to transfer to cities to which they did not wish to transfer. The district court also found in favor of Arnold on this theory, finding that the "[d]efendant was unable to proffer a legitimate, nondiscriminatory reason for using the senior-first rule because no such reason exists." *Id.* at 19.

## B.

On appeal, the Postal Service attacked the district court's conclusions on four fronts. First, it argued that the district court erred in applying disparate impact analysis—typically applied under Title VII—to an ADEA case. Second, the Postal Service argued that, even if disparate impact analysis is appropriate in an ADEA context, the district court erred in finding that the directed involuntary transfer under the CPP had a disparate impact in the instant case. Third, the Postal Service argued that the "senior-first" rule is job-related and thus falls within the business

necessity exception to the ADEA. And finally, the Postal Service challenged the district court's finding of *disparate treatment* on the ground that the district court applied the wrong legal standard in reaching its conclusion.

### C.

Although the majority discusses the applicability of the *disparate impact* theory to ADEA cases, it ultimately reaches no conclusion on this issue. The majority apparently rejects the district court's factual finding that the CPP had a disparate impact on older postal inspectors. It does so, however, without reviewing the district court's finding under our clearly erroneous standard of review.

With respect to *disparate treatment,* the majority rejects as "clearly erroneous" the district court's finding that the "senior-first" policy amounted to disparate treatment of older postal inspectors. As with disparate impact, the majority reaches this conclusion because it ignores the impact of the "senior-first" rule of mandatory transfer. Rather, the majority argues that the appropriate analysis must include the voluntary transfers permitted under the CPP.

### D.

As I have indicated, my disagreement with the majority is manifold. First, unlike the majority, I believe that this case requires us to address the application of the disparate impact theory to ADEA cases. I would hold that in this respect there is no meaningful distinction between Title VII and the ADEA and that the disparate impact theory should be available to ADEA plaintiffs. Secondly, I believe that the majority has reversed the district court's finding of disparate impact without reference to either the appropriate standard of review or to the considerable evidence in the record supporting the district court's finding. Lastly, I believe that without analyzing the extensive record, and without deferring to the district court's findings of fact supported by evidence, the majority has improperly substituted its personal judgment for the district court's findings. I

turn first, therefore, to a consideration of Arnold's disparate impact theory.

### III.

### A.

The Postal Service has argued that disparate impact analysis is not available in cases arising under the ADEA, I can discern no compelling argument why it should not. That the ADEA's coverage and provisions are substantially similar to the provisions of Title VII is no accident. The similarity between these two statutes flows from the fact that the ADEA was modeled after Title VII, relying on much of Title VII's actual language for its content. *See Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978).

Under Title VII, employees can prove discrimination by showing either disparate impact *or* disparate treatment. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Because of the similarity between Title VII and the ADEA, many ADEA cases within and without this Circuit have utilized the "tripartite evidentiary scheme developed in the context of Title VII litigation," *Krodel v. Young,* 748 F.2d 701, 705 (D.C.Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), in disparate treatment cases arising in the ADEA context. *See also; Loeb v. Textron, Inc.,* 600 F.2d 1003, 1015 (1st Cir.1979); *Schwager v. Sun Oil Co.,* 591 F.2d 58, 60–61 (10th Cir.1979). Similarly, many Courts of Appeals now allow employees to establish a violation of the ADEA by demonstrating disparate impact alone. *See e.g. Blum v. Witco Chemical Corp.,* 829 F.2d 367, 372 (3d Cir.1987); *Holt v. Gamewell Corp.,* 797 F.2d 36, 37 (1st Cir.1986); *EEOC v. Borden's Inc.,* 724 F.2d 1390, 1394–95 (9th Cir.1984); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 690 (8th Cir.1983); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). Two of this court's ADEA opinions have made reference to disparate impact analysis, although neither directly addressed the question of whether

that analysis should be employed in ADEA cases. *See Schmid v. Frosch,* 680 F.2d 248, 250–51 (D.C.Cir.1982); *Krodel,* 748 F.2d at 709.

As I have indicated, there is no reason why disparate impact theory should not be available for those seeking relief under the ADEA. The similarity between Title VII and the ADEA, along with the ADEA's history, argue in favor of such importation. In *Lorillard,* 434 U.S. at 584, 98 S.Ct. at 872, the Supreme Court observed that "the [substantive] provisions of the ADEA were derived *in haec verba* from Title VII." Moreover, in *Griggs,* 401 U.S. at 429, 91 S.Ct. at 852, the Court explained that Congress's objective in enacting Title VII was "plain from the language of the statute" and, on the basis of that language, held that Title VII "proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853. *See also Watson v. Fort Worth Bank and Trust,* — U.S. ——, 108 S.Ct. 2777, 2785–86, 101 L.Ed.2d 827 (1988) (Facially neutral employment practices that have significant adverse effects on protected *groups* may violate Title VII without proof of discriminatory intent).

Given that the text of the ADEA was derived largely from that of Title VII, and given that the Supreme Court's acceptance of disparate impact theory was based on Title VII's express language, it would be anomalous to conclude that disparate impact analysis should not be followed in proving an ADEA violation. Indeed, no Court of Appeals that has been faced with this question has decided it differently.

Moreover, Title VII, by its terms, is designed to protect against discrimination based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2. Each of these categories shares a single distinctive feature: each is a facet of human existence with which a person is born, and which is largely beyond his or her control. Thus, under Title VII, Congress has decreed that certain adverse employment decisions made by employers based on an individual's possession of any of these characteristics, is repugnant and illegal. In enacting the ADEA, Congress has also decreed that employment decisions based on *age,* (an equally immutable characteristic), are similarly repugnant and illegal.

Because I am satisfied that in this context, there is no distinction between Title VII and the ADEA, I conclude that the district court did not err when it stated that "a violation of the ADEA may be proved by showing that an employment practice, such as the senior-first rule, which is involved in this case, has a disparate impact on a protected class, namely postal inspectors 40 years of age and above." 667 F.Supp. at 19.

### B.

Having concluded that the district court did not err in applying the theory of disparate impact in this case. I consider next the appropriate standard of review for the district court's finding that the "senior-first" component of the CPP did in fact have a disparate impact on the most senior Level 23 inspectors. The record contains evidence that supports the district court's finding of disparate impact—a finding to which we must defer unless clearly erroneous.

In discussing this question, the majority fails to articulate any standard of review. Yet, the case law makes clear that findings of disparate impact and disparate treatment are reviewed under a clearly erroneous standard. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985) (disparate treatment); *Palmer v. Shultz,* 815 F.2d 84, 101 (D.C.Cir.1987) (disparate treatment); *Kilgo v. Bowman Trans., Inc.,* 789 F.2d 859, 872–73 (11th Cir.1986) (disparate impact); *Griffin v. City of Omaha,* 785 F.2d 620, 625 n. 6 (8th Cir.1986) (disparate treatment); *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 141, 142–43 (1st Cir. 1985) (disparate impact), *cert. denied,* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); *Lewis v. Bloomsburg Mills, Inc.,* 773 F.2d 561, 569 n. 14 (4th Cir.1985) (disparate impact); *Smith v. Western Electric*

*Co., Inc.*, 770 F.2d 520, 524 (5th Cir.1985) (disparate impact and disparate treatment).

In *Anderson* the Supreme Court defined "clearly erroneous" as follows:

Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles, ... is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of the fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also *Inwood Laboratories Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

*Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

The district court's "account of the evidence" in this case, was at the very least "plausible". The majority, by ignoring the prescribed standard of review has performed precisely the type of *de novo* review forbidden by the Supreme Court in *Anderson.*

### C.

In order to establish a *prima facie* case of age discrimination on the basis of a facially neutral employment policy's disparate impact, a plaintiff is not required to demonstrate that the policy is the result of an employer's discriminatory intent, but need only establish that the policy impacts disproportionately on persons protected by the ADEA. *Leftwich v. Harris–Stowe State College*, 702 F.2d at 690; *Geller v. Markham*, 635 F.2d at 1032. *See also Griggs v. Duke Power Co.*, 401 U.S. at 431–32, 91 S.Ct. at 853–54.

Here, the district court found that the CPP had a disproportionate impact on the most senior Level 23 inspectors because its "senior-first" rule was in essence an "older-first" rule, and subjected the older postal inspectors to directed transfers first." 667 F.Supp. at 23. The district court reached this conclusion on the basis of the statistical evidence offered into evidence by Arnold. This evidence, which constituted an appropriate way of proving disparate impact, *see e.g. Hazelwood School Dist. v. United States*, 433 U.S. 299, 306–309, 97 S.Ct. 2736, 2740–2742, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 337–340, 97 S.Ct. 1843, 1855–56, 52 L.Ed.2d 396 (1977); *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 372 (3d Cir.1987); *Palmer v. Schultz*, 815 F.2d 84, 91 n. 6 (D.C.Cir.1987); *Leftwich v. Harris–Stowe State College*, 702 F.2d at 690, overwhelmingly demonstrated that a disproportionately large number of the Level 23 inspectors over the age of forty were forced, against their wills, to move to the more expensive MMAs. On the basis of this statistical evidence, the district court found that "the senior-first rule fell more harshly on plain-

tiffs [over the age of 40] than on postal inspectors under the age of 40 ...." The district court then concluded that this factual finding supported the conclusion that the "senior-first" rule violated the ADEA. 667 F.Supp. at 23.

As illustrated by the hypothetical example set forth at the outset of this dissent in Part II, no other conclusion can logically be reached. If the "senior-first" rule violates the ADEA and therefore is tainted, its taint cannot be sanitized by the remaining innocuous provisions of the Postal Service policy. Indeed, nowhere in the majority opinion is it ever suggested that the "senior-first" rule by itself does not violate the ADEA. Nor is it an answer to the district court's finding of illegality, that Arnold has focused on only one provision of the three-part CPP as the majority argues.

### D.

I am not convinced by the Postal Service's contention, accepted by the majority, that disparate impact may not be established by isolating one component of the CPP, rather than considering its overall effect on the protected class of Level 23 inspectors. The gravamen of the majority's position is that the district court erred in rejecting Postal Service's statistical evidence as to the effect of the CPP with respect to *all* postal inspectors (both above and below the age of 40), in favor of Arnold's proofs which focused on the effect of the "senior-first" rule on Level 23 inspectors over the age of 40. The majority claims that, when viewed in terms of its three component parts—(1) voluntary transfers of Level 23 inspectors; (2) voluntary transfers of Level 21 inspectors who are promoted to fill Level 23 vacancies; and (3) senior-first directed transfers—the CPP does not impact unfavorably on older Level 23 inspectors. In so concluding, the majority reasons that when one examines the pool of all Level 23 postal inspectors who have been transferred, both voluntarily and involuntarily, there is no disproportionate representation of inspectors aged 40 and older.

I believe that the majority has missed the point of Arnold's complaint. No objection has ever been lodged against the policy component of *voluntary transfers*. Arnold's only complaint is with the *involuntary transfers*. When the district court examined the pool of inspectors, who had been subject to *involuntary transfers*, it found that it was "1.9 to 2 times more likely that a postal inspector 40 years of age and above will be directed to transfer than a postal inspector under 40 years of age." 667 F.Supp. at 23.

In order to reach its conclusion, the majority attempts to distinguish *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). Maj. op. at 999. I find the distinction wholly unpersuasive. I read *Teal* as being inconsistent with the Postal Service's argument that the "senior-first" rule must be analyzed as part of the CPP "package" and may not be evaluated in isolation. My understanding of *Teal* is consistent with that expressed by the Third Circuit in *Massarsky v. General Motors Corp.*, 706 F.2d 111 (3d Cir.1983), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983), in which the court characterized *Teal* as standing for the proposition that "an employment practice must be analyzed at the first step in the employment process that produces an adverse impact on a [protected group], not the end result of the employment process as a whole." *Id.* at 122.

In *Teal*, Connecticut required all employees to pass a written examination prior to becoming eligible for permanent supervisory positions. Pass rates on the examination were significantly lower for black employees than for white employees, thus excluding a disproportionately high number of black candidates from further consideration. A number of black employees brought suit under Title VII, claiming that the examination had a discriminatory impact on black employees and was not job related. The state answered these allegations by arguing that while proportionately fewer blacks became eligible for promotion as a result of the examination, a disproportionately higher number of blacks who were eligible were ultimately given pro-

motions to supervisory positions. The state argued that the "bottom-line" result, which was more favorable to blacks than to whites, constituted a complete defense to the putative Title VII violations.

The Supreme Court rejected Connecticut's "bottom-line" rationale on the ground that Title VII protects individuals, not classes, from discrimination. The Court made clear that fairness to a group as a whole cannot justify unfairness to individual employees because Title VII's "focus on the individual is unambiguous." *Id.* at 455, 102 S.Ct. at 2534–35. Although the *Teal* Court recognized that a nondiscriminatory "bottom-line" might assist an employer in rebutting an inference of discrimination, the Court noted that "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." *Id.* at 454, 102 S.Ct. at 2534–35.

Thus, I would hold that the district court was correct in analyzing and separating out the discrete effects of the "senior-first" rule, and finding that the CPP had a disparate impact on senior-Level 23 inspectors.

### E.

The implication of the majority's opinion is that the district court erred in rejecting the Postal Service's statistical data in favor of the data submitted by Arnold.

The Postal Service's statistics analyzed the affect of the "senior-first" rule on *all* postal inspectors, including those who were and are temporarily or permanently exempt from the "senior-first" rule. By using average data and binomial distribution analysis (which predicts the probability of transferring a postal inspector 40 years of age and older when chosen from the entire pool of eligible postal inspectors both over, and under, 40), the Postal Service was able to demonstrate that those over 40 did not stand a significantly higher chance of being transferred, than those under 40.

Arnold's proofs, on the other hand, analyzed the affect of the "senior-first" rule on those to whom the rule applies—non-exempt, Level 23 inspectors. The district court properly concluded that the relevant pool from which to measure the effect of the "senior-first" rule should include only those who are eligible for directed transfer. This conclusion was supported by the testimony of Chief Postal Inspector Clauson who testified that the CPP necessarily affected the older inspectors adversely. Upon questioning by the court, Chief Clauson testified as follows:

THE COURT: Now, by the use of the seniority system, it's far more likely than not that that is going to have an effect upon the more senior, older employees, is it not?

THE WITNESS: Yes, your honor. Particularly the directed transfer portion.

THE COURT: That is what I am talking about.

THE WITNESS: Yes.

THE COURT: The directed transfer.

THE WITNESS: Yes.

THE COURT: And that is going to happen in most every case in the directed transfer situation, is it not?

THE WITNESS: Senior person; yes, sir.

THE COURT: And the only way, Chief Clauson, that could be corrected would be to go to a random system of selecting people for directed transfer in order to avoid the impact on age of your seniority system. Isn't that right?

THE WITNESS: That is one way; yes, sir.

THE COURT: It's the only way, isn't it?

THE WITNESS: Well, the other option was to go like the junior and probably the reverse.

THE COURT: That wouldn't have accomplished your mission.

THE WITNESS: That's right. That's right.

THE COURT: But by using seniority, it does have an effect, an adverse effect, by reason of a person's age. Doesn't it?

THE WITNESS: Yes, your honor.

Supp.App. at 52–3.

The district court made a factual finding that Arnold's data and evidence better reflected the effect of the "senior-first" rule

on the protected class of postal inspectors. In light of the evidence of record there can be no doubt that the district court's finding was not clearly erroneous. Because our review of the district court's factual findings is governed by this highly deferential standard, I perceive no principled basis by which to justify the majority's holding that no disparate impact was demonstrated.

### F.

In its final argument, with respect to disparate impact, the Postal Service contended that, even if the district court's finding of disparate impact is correct, the court applied the wrong legal standard in holding that no valid "job relatedness" had been demonstrated by the Postal Service with respect to the directed transfer component of the CPP. Although the majority did not find it necessary to discuss this issue because of its holding that the district court had erred, my analysis, which would sustain the district court's findings, obliges me to discuss this issue.

As the Postal Service correctly points out, when disparate impact has been established, an employer's burden of rebuttal has been described by the Supreme Court as showing that the challenged practice is "job related," *New York Transit Authority v. Beazer*, 440 U.S. 568, 587, 99 S.Ct. 1355, 1366, 59 L.Ed.2d 587 (1979); that it bears a "manifest relationship" to the job in question, *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854; or that it is justified by "business necessity," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

In this case, the district court stated that in order to "establish a business necessity defendant must have had *no other choice* but to transfer the most senior Level 23 postal inspectors to fill the vacancies in Major Metropolitan Areas." 667 F.Supp. at 23–24 (emphasis added). The Postal Service argued that the district court's "no other choice" standard was unfairly harsh and placed too great a burden on the Postal Service to prove business necessity.

While I agree that the district court's standard was perhaps demanding in view of the Supreme Court's test as enunciated in *Griggs*, I am convinced that, given the testimony adduced by the Postal Service at trial, *see* 667 F.Supp. at 24, the Postal Service would not have prevailed even under the less stringent standard set forth in *Griggs v. Duke Power*. Thus, if the district court did in fact utilize too demanding a standard, its use of that standard constituted harmless error. In *Griggs*, the Court stated that:

> [t]he touchstone is business necessity. If an employment practice which operates to exclude [the protected class] cannot be shown to be related to job performance, the practice is prohibited .... [that employment practice must] bear a demonstrable relationship to successful performance of the jobs for which it was used.

*Id.* at 431, 91 S.Ct. at 853.

Under this standard, which appears to be somewhat more permissive than the standard used by the district court, the business necessity defense of the Postal Service would also fail. The district court noted that in the Postal Service's Chief Inspector's testimony that the "senior-first" rule was justified by the Service's need for:

> (1) more *experienced postal inspectors* in major metropolitan areas, (2) a *perpetual* system for remedying the shortage of experienced postal inspectors in major metropolitan areas, and (3) a *predictable* system for directing transfers of experienced postal inspectors to major metropolitan areas.

667 F.Supp. at 24.

As the district court logically found, these reasons fail to satisfy the "no other choice" test used by the district court and, in my view, these reasons would also fail the somewhat less demanding "demonstrably related to job performance" test enunciated in *Griggs*. Randomly selecting Level 23 inspectors, rather than requiring "senior-first" transfers, would satisfy the Service's need for a "perpetual," "predictable" system that ensured the placement of "ex-

perienced postal inspectors" in major metropolitan areas. This is borne out by the fact that the Service allowed any Level 23 inspector to voluntarily transfer, and even allowed less experienced Level 21 inspectors to transfer to fill MMA vacancies. As the district court observed, "there was more than ample evidence in the record to show that defendant's alleged need for 'experienced' postal inspectors was no more than a need for Level 21 and higher inspectors." 667 F.Supp. at 24.

Indeed, the district court discounted the Postal Service's justification when it found, "[a]lthough defendant attempts to justify the senior-first rule by arguing that it has a business need for the most senior postal inspectors in the major metropolitan areas, the evidence before the Court clearly shows that defendant's real business need was for Level 21 or higher postal inspectors of *any seniority*." *Id.* at 19. Thus, whatever standard was utilized, it was evident under the district court findings, all of which were supported by evidence, that the Postal Service's business necessity defense was unavailing.

Accordingly, I am satisfied that the district court's reasoning in this respect was sound, its findings were not clearly erroneous, and, each finding was fully supported by evidence.

### G.

Overall therefore, I am satisfied that the district court correctly applied a theory of disparate impact. The district court findings were supported by evidence that the Postal Service had violated the ADEA by the "senior-first" component of the CPP. Those findings must be upheld when reviewed under our clearly erroneous standard.

I turn next to a consideration of disparate treatment.

### IV

It has been established under Title VII that *disparate treatment* claims can involve an isolated incident of discrimination against a single individual, or, allegations of a "pattern of practice" of discrimination affecting an entire class of individuals. *Palmer v. Schultz*, 815 F.2d 84, 90 (D.C. Cir.1987); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). I see no reason why the district court should not have followed this approach in the ADEA context.

The question before us therefore, is whether the district court improperly found that the CPP was designed and implemented with full knowledge that it intentionally discriminated against Level 23 inspectors aged 40 and above. In *Palmer*, the court stated that plaintiffs in Title VII pattern and practice cases need not rely on statistical evidence alone, to establish intentional discrimination:

> Because the ultimate issue in a disparate treatment case is whether the disparity resulted from unlawful discriminatory animus, plaintiffs may introduce any additional evidence which is probative on this issue.... When plaintiffs in a Title VII pattern or practice case rely on evidence in addition to the evidence of the disparity itself, the issue for the trier of fact in determining whether the plaintiffs have established a *prima facie* case must be ·whether the totality of plaintiff's evidence (again including the evidence of the disparity itself) demonstrates that, more likely than not, the disparity resulted from an unlawful animus....

815 F.2d at 96–7.

Courts generally apply the tripartite evidentiary scheme developed in the context of Title VII litigation to suits brought under the ADEA. *See Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 342–43 (D.C.Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). Under these guidelines, an individual claiming disparate treatment must make out a *prima facie* case using sufficient facts to give rise to a reasonable inference that race, sex or age was a factor in the employment decision at issue. *Krodel v. Young,* 748 F.2d 701, 705 (D.C.Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51

(1985). "Once a *prima facie* case has been established, the employer bears a minimal burden of "producing evidence" tending to show that the plaintiff was denied employment or promotion for a legitimate nondiscriminatory reason." *Id.* If the employer successfully produces credible evidence to this effect, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's asserted legitimate reason is a "pretext" for discrimination. *Id.* (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–02, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668 (1973)).

In clarifying exactly what type of action rises to the level of disparate treatment, this court has stated:

> In an ADEA case, the plaintiff's ultimate burden is to prove that age was 'a determining factor' in the challenged employment decision.... The plaintiff must prove that 'age made a difference in the employer's decision,' ... in the sense that, 'but for' the discriminatory motive, the employee would have been hired, promoted or retained.... The question of discriminatory intent, moreover, is a finding of fact subject to the 'clearly erroneous' standard of review.... [A] district court's ADEA ruling .... can thus only be overturned if the court committed legal error or if we are 'left with the definite and firm conviction that a mistake has been committed.'

*Krodel,* 748 F.2d at 706.

In the present case, there can be no question but that the district court utilized the proper legal standard when analyzing the effect of the CPP on Level 23 senior inspectors. The district court's analytical framework virtually tracks the framework set forth in *McDonnell Douglas,* 411 U.S. at 800–02, 93 S.Ct. at 1823–24—a framework subsequently adopted by our court as a model for analyzing disparate treatment claims under the ADEA. *See Krodel,* 748 F.2d at 705–06. The district court methodically analyzed whether the plaintiffs had established a *prima facie* case against the Postal Service; whether the defendant had produced evidence of a legitimate, non-discriminatory reason for the senior-first rule;

and whether the plaintiffs proved by a preponderance of the evidence that the Postal Service's reason for the senior-first rule was a pretext for its discriminatory animus.

A. *The Prima Facie Case:*

The district court held that the inspectors established a *prima facie* case by demonstrating that the Postal Service forced its most senior Level 23's to transfer and that there was a statistically significant correlation between seniority and age. The district court found that, because the Service was aware of this correlation, the statistical correlation between the age and seniority was sufficient to raise an inference of disparate treatment. The district court was also persuaded by Chief Inspector Clauson's testimony that "he knew age and seniority correlated and that the senior-first rule would adversely affect the older postal inspectors." 667 F.Supp. at 27. Indeed, Chief Inspector Clauson, in a letter to then Chief Inspector Fletcher, wrote that he believed that any such discriminatory rule would be challenged and that a non-discriminatory system should be used. *Id.* On the basis of this evidence, the district court found that "defendant's disregard for the adverse effect of the Rule on postal inspectors 40 years of age and over and the correlation between age and seniority raise far more than an inference of age discrimination." *Id.*

I have no difficulty with the district court's finding. It is clear from the evidence produced by Arnold that inspectors over the age of 40 received a statistically disproportionate number of directed transfers. In addition, Clauson testified that when the Service adopted the "senior-first" rule it knew that such a rule was the equivalent of an "oldest-first" rule. Supp.App. at 52–3. Clauson testified that he knew that seniority and age were correlated, that he was aware of the antidiscrimination laws, that there was "a good chance, if not [a] certainty" that the directed transfer component of the CPP would be challenged, Supp.App. at 51, and that he knew the "senior-first" rule was "far more likely than not ... to have an effect upon

the more senior, older employees" and "an adverse effect, by reason of a person's age." Supp.App. at 52–53.

Moreover, once a correlation between seniority and age was found, the very provision of the CPP itself which mandates involuntary transfers of senior Level 23 inspectors without more, satisfies the *prima facie* test. I am, therefore, satisfied, even though the majority holds otherwise, that Arnold made out a more than adequate *prima facie* case.

### B. *Was There a Legitimate, Non–Discriminatory Reason?*

In the next step of the disparate treatment analysis, the defendant must meet its burden of production by adducing evidence of a legitimate, nondiscriminatory reason for its action. *See Krodel*, 748 F.2d at 705.

The Postal Service claimed that its "senior-first" rule provided a perpetual and predictable system for transferring experienced postal inspectors to the major metropolitan areas. The district court rejected this "business necessity" proffer, as I do. As the district court pointed out, there was no valid need for the Postal Service to transfer the most senior Level 23 postal inspectors, particularly under a "senior-first" rule which discriminated on the basis of age. 667 F.Supp. at 27.

Moreover, the evidence was undisputed that the Postal Service's need was for Level 21 (or higher postal) inspectors of *any* seniority. *Id.* at 19. As the record discloses the difference between Level 21 and Level 23 inspectors has little to do with familiarity with the particular tasks each is assigned. Rather, the difference is found only in the functional areas in which each operate. *Id.* at 11. Level 21 inspectors have assignments in *four* functional areas while Level 23 inspectors specialize in *one* of those *four* areas. Thus, the explanation provided by the Postal Service for mandatory and involuntary transfers of its older inspectors, when younger inspectors of equal ability were not transferred, just does not hold water.

In a "pattern or practice" class action case such as this one (as opposed to an individual discrimination claim),

> the employer is not required to meet a burden of persuasion in rebutting the disparate treatment claim, [but] the nondiscriminatory explanation must cast sufficient doubt on the plaintiff's proof to permit the trier of fact legitimately to decline to draw an inference of discrimination from that proof. The bare articulation of a nondiscriminatory explanation, while sufficient to rebut an individual plaintiff's low-threshold *McDonnell Douglas* showing, generally will not suffice as a rebuttal to a typical class-wide showing of pervasive discrimination.

*Segar*, 738 F.2d at 1269. As the *Burdine* Court put it:

> In saying that the presumption [of discrimination] drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a *prima facie* case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inference properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. *Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.*

*Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1094–95 n. 10 (emphasis added). It is this underscored language that the district court appears to have relied upon. The district court found that Arnold had adequately discredited the Postal Service's proffered reasons for adopting the "senior-first" rule and it thus concluded that the Postal Service had not sustained its burden of production. Because I am not persuaded, as apparently the majority is (Maj. Op. at 999) that we should ignore the discriminatory prong of the CPP's three-prong policy, and because the "senior-first" prong is in my view, discriminatory and illegal

(as the hypothetical example in Part II of this dissent demonstrates), I would sustain, as not clearly erroneous, the district court finding that the Postal Service has not met its burden of producing evidence of a legitimate non-discriminatory business reason for adopting the CPP.

### C. *Was the Postal Service's Proffered Reason a Pretext?*

Although the district court need not have applied this part of the tripartite test, it nevertheless found that, even if the Postal Service had met its burden of production, the Level 23 inspectors had proved that the "senior-first" rule was a pretext for age discrimination in this case and that the service nevertheless knowingly implemented the policy. 667 F.Supp. at 27.

The district court once again noted that the Postal Service knew that seniority and age were correlated and the "senior-first" rule essentially amounted to an "older-first" rule. The district court also emphasized that the Postal Service failed to prove that it needed the most senior Level 23 inspectors to meet its requirements in the MMA's to which they were involuntarily transferred. On the basis of these findings, the district court concluded that the "senior-first rule was a pretext to mask its discriminatory animus and motive." 667 F.Supp. at 28.

While Arnold may not have clearly demonstrated that a discriminatory reason more likely motivated the Postal Service in this case, Arnold has succeeded in demonstrating that the Service's proffered explanation is "unworthy of credence." In *Krodel,* the court made it clear that an ADEA plaintiff need not submit direct evidence of discriminatory intent, and that " 'the district court must decide which party's explanation it believes....' " 748 F.2d at 707. The court also stated that:

> [This court] has ... not required an ADEA plaintiff to offer particularized evidence of intentional discrimination in order to prove pretext ... In *Cuddy,* the court indicated that age discrimination plaintiffs almost necessarily have to rely on indirect evidence, including discrepancies in the defendant's proffered

explanation, to prove that an employer was motivated by illegitimate concerns. *Krodel,* 748 F.2d at 707. Applying our standard as discussed in *Krodel,* I conclude that the district court was not clearly erroneous in determining that the Postal Service's announced reasons for the "senior-first" policy were pretextual.

Unlike the majority, I do not believe it appropriate to find facts at this level of review. Thus, even if the proofs were otherwise, I cannot find as the majority does, that the Postal Service's "senior-first" policy was "universal" and "neutral." Maj. op. at 1000.

### V.

Because I cannot agree with the majority interpretation of the ADEA—an interpretation which permits adverse and undesirable employment conditions to be visited upon senior inspectors solely because of their age, and because I cannot agree that non-jury findings of the district court which are supported by evidence should be given no deference, I have been obliged to dissent.

I have gone to some length in this separate opinion to explain my disagreement with the majority's analysis, because I am concerned that a narrow interpretation of the ADEA as the majority has construed it, together with a disregard of district court findings, may well lead to a similar result in other cases—a result, which was not intended by the Congress when it enacted ADEA to protect individuals from age discrimination.

Accordingly, giving the appropriate deference to the district court findings and giving an appropriate construction to the ADEA—a construction which implements the congressional purpose underlying the Act—I would affirm the district court which found that the CPP violates the Act under both disparate impact and disparate treatment theories.